# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
)
WILLIAM JOSEPH KIELCZEWSKI,                    )
)                    Petition For Review
*Petitioner*,                    )
v.                    )          Case No.  26-1006
)
UNITED STATES SECURITIES AND                    )          SEC Release No. 104352
EXCHANGE COMMISSION,                    )
)          Admin. Proc. File No. 3-20636
*Respondent*.                    )
)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## <u>PETITON FOR REVIEW</u>

Petitioner William Joseph Kielczewski petitions this Court pursuant to 15 U.S.C § 78y(a) and Federal Rule of Appellate Procedure 15(a) for review of the Final Order of the Securities and Exchange Commission entered on December 9, 2025, in Administrative Proceeding 3-20636; SEC Release No. 104352, sustaining disciplinary action taken by FINRA. The copy of the Commission's Order is attached as Exhibit A.

January 8, 2026                    Respectfully Submitted,


_____*/s/ Barry J. Pollack*_____
Barry J. Pollack (Bar # 43012)
Harris St. Laurent & Wechsler LLP
1775 Pennsylvania Ave., Suite 650
Washington, DC 20006
(202) 230-9647
bpollack@hs-law.com

*Attorney for Petitioner*

## EXHIBIT A

SEC ORDER: December 9, 2025

SEC RELEASE NO.: 104352

ADMIN. PROC. FILE NO.: 3-20636

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C.

SECURITIES EXCHANGE ACT OF 1934
Release No. 104352 / December 9, 2025

Admin. Proc. File No. 3-20636

---

In the Matter of the Application of

WILLIAM JOSEPH KIELCZEWSKI

For Review of Disciplinary Action Taken by

FINRA

---

OPINION OF THE COMMISSION

REGISTERED SECURITIES ASSOCIATION — REVIEW OF DISCIPLINARY PROCEEDING

FINRA suspended Applicant and imposed other sanctions after finding that he participated in private securities transactions, made false statements to his employer firm, and caused the firm to file a misleading Form U4 and four misleading Form U4 amendments. *Held*, FINRA's findings of violations and sanctions are *sustained*.

APPEARANCES:

*Andrew St. Laurent* of Harris St. Laurent & Wechsler LLP and *Justin L. Chretien* and *Natalie A. Napierala* of Carlton Fields for William Joseph Kielczewski.

*Alan Lawhead, Michael Garawski, Jennifer Brooks,* and *Michael Smith* for FINRA.

Appeal filed:  October 28, 2021
Last brief received:  November 21, 2023

William Joseph Kielczewski, a former registered representative of FINRA member Huntington Investment Company ("Huntington"), seeks review of FINRA disciplinary action. FINRA found that Kielczewski, while employed by Huntington, (1) violated National Association of Securities Dealers ("NASD") Rule 3040 and FINRA Rules 2010 and 3280 by engaging in "private securities transactions" ("PSTs") with Huntington customers on behalf of Mariemont Capital Partners, LP (the "Fund"); (2) violated FINRA Rule 2010 by making false statements to Huntington about those PSTs and his management role at the Fund; and (3) willfully provided misleading information on a Form U4 and four amendments, in violation of FINRA Rules 1122 and 2010, and Article V, Section 2(c) of FINRA's By-Laws.

FINRA suspended Kielczewski for 18 months, ordered that he requalify before reassociating with any member firm, fined him $50,000, and found him subject to a statutory disqualification. After an independent review of the record, we sustain the findings of violations and affirm the sanctions imposed.

## I. Background

### A. Kielczewski founded the Fund with Kevin Taylor and moved to Huntington, which understood him to be a passive investor in the Fund.

In late 2013, Kielczewski and Kevin Taylor, both of whom were then associated with Fifth Third Bancorp, faced declining revenues in their portfolio of pooled non-agency residential mortgage-backed securities ("RMBS") following the 2008 financial crisis. In response, Kielczewski and Taylor launched the Fund, which they hoped could more readily invest in RMBS than Fifth Third could.

At approximately the same time, Gregory Chapman, Kielczewski's former supervisor at Fifth Third, recruited him to Huntington, with the expectation that Kielczewski would attempt to transition his Fifth Third clients' non-RMBS business to Huntington. Chapman believed that Kielczewski was merely a passive investor in the Fund and Taylor would separately solicit those clients' RMBS business for the Fund. Kielczewski left Fifth Third in November 2013 and joined Huntington in January 2014.

### B. Kielczewski actively managed the Fund and solicited Fund investments from Huntington clients.

From 2014 to 2016, Kielczewski engaged in various management and operational activities on the Fund's behalf. From the Fund's establishment, Kielczewski was in regular contact with Taylor about how the Fund would invest its assets; often identified investment opportunities that he believed the Fund should pursue; and reviewed and edited the Fund's quarterly reports, financial statements, and marketing materials. Kielczewski held an initial 10% ownership interest in the Fund, which grew to 22.25% by 2017 without him making any additional capital contribution.[1]

---

[1]     The record is unclear about the basis for the Fund's determination to increase Kielczewski's stake.

Kielczewski also solicited five of his former Fifth Third clients to open accounts at Huntington, as well as invest a total of approximately $10 million in the Fund (the "Fund Investors"):

- In January 2014, Kielczewski contacted an insurance agency, HGI, about a "new potential investment" in the Fund, forwarded Fund marketing materials to HGI, and met with an HGI executive to describe the offering. In April 2014, Kielczewski again promoted a potential investment in the Fund to HGI, which subsequently opened a Huntington brokerage account and made two investments in the Fund.

- In January 2014, SCCI, a chemical manufacturer, invested in the Fund after meeting with Kielczewski and Taylor. Kielczewski then successfully encouraged a second SCCI investment whereby SCCI transferred cash from its Huntington account to the Fund. Kielczewski facilitated wire transfers of funds for each investment.

- In January 2014, after Kielczewski's clients WI and RI, a married couple, agreed to invest in the Fund, he helped them to determine which securities they should liquidate from their Huntington account to finance their investment. Kielczewski then executed the liquidation and arranged the transfer of the proceeds to the Fund.

- In March 2016, Kielczewski met KK, a principal of construction company K&R, to discuss moving funds in their Fifth Third brokerage accounts to Huntington and the Fund. After KK and K&R opened Huntington brokerage accounts, Kielczewski emailed KK instructions to wire funds from his Huntington account to the Fund and told him to "hurry" his investment. K&R invested in the fund two days later, and KK invested in the Fund in June 2016.

**C. Kielczewski disclosed only a minor passive role at the Fund to Huntington.**

FINRA Rule 3280 prohibits associated persons, like Kielczewski, from engaging in PSTs, which it defines as "any securities transaction outside the regular course or scope of an associated person's employment with a member," unless the associated person provides written notice to their employer before engaging in them. Rule 3280 applies to transactions in which an associated person "may receive" outside compensation in the form of "rights of participation in profits."

Huntington's written supervisory policies and procedures ("WSPs") further prohibited the firm's associated registered representatives from participating in PSTs, which the WSPs defined as "outside business activities involving securities transactions . . . engaged in by the individual outside his or her regular course of activities . . . ." The WSPs in turn defined "outside business activities" as "any outside activit[ies]" whereby Huntington personnel were "employed in any way outside of the normal scope of [their] employment with" Huntington, including "any investment or affiliation with a private business" but excluding "passive investments and activities . . . from which an individual receives income" but "performs no service." The WSPs further required registered representatives to notify Huntington's compliance department in writing before participating in PSTs.

In December 2013, as part of his initial registration with Huntington, Kielczewski answered "yes" on a compliance questionnaire asking if he participated in PSTs. Kielczewski also answered "yes" to the form's question of whether he had any outside business activities. As a result, Huntington compliance required Kielczewski to complete a separate "Disclosure of Outside Business Activity" form, in which he stated that he was a "passive owner/investor" of the Fund and estimated that he devoted "[a]pprox. 1 hour a month" to it, with annual compensation of "$50,000." He also wrote that he had "[n]o business duties" and was merely an "[i]nvestor and owner in a partnership that invests in non conforming [R]MBS."

Huntington compliance then asked Kielczewski to clarify his relationship with the Fund, noting that Huntington "normally [did not] allow these types of transactions." Kielczewski responded that he was merely "a passive general partner . . . not a manager" and that his "passive ownership will not conflict with [Huntington] clients." Mark Gregory, then Huntington's chief compliance officer, asked Kielczewski to clarify that, as a passive investor, he did "not engage in any private securities transactions." Kielczewski confirmed that was "correct," adding that he "must have misunderstood what the private securities transactions question was."

Two years later, in December 2015, Kielczewski completed a Huntington questionnaire about outside business activities, in which he stated that he had not engaged in any private securities transactions.

In April 2016, in connection with a routine FINRA examination, Kielczewski also completed a FINRA "Personal Activity Questionnaire," in which he disclosed that he was engaged in "outside employment/activities or [PSTs]" through his position as a "[s]ilent minority partner in" the Fund. He further claimed that this required "0 hours per week" of his time.

In May 2016, as part of that examination, FINRA staff questioned Kielczewski about the Fund. According to Kielczewski, he acknowledged to FINRA that "there were a lot of conflict[s] of interest[]" between his job at Huntington and his role at the Fund but that he believed Huntington had mitigating procedures in place, including what he described as a commitment between himself, Chapman, and Taylor for "full transparency" in the Fund's investments, and the fact that Kielczewski had no access or visibility to an account the Fund had opened at Huntington, which was instead serviced by an employee unaffiliated with the Fund.

**D.    Following FINRA's examination, Huntington heightened its supervision, and Kielczewski again represented his Fund role as passive.**

In July 2016, in response to Kielczewski's statements during his interview with FINRA, Huntington compliance asked Kielczewski to further clarify his relationship to the Fund. Consistent with his earlier disclosures, Kielczewski responded that he had merely "a passive role in" and did "not solicit funds for" the Fund. He also completed an updated "Disclosure of Outside Business Activity" form, in which he again identified the Fund as an outside business activity, described himself as a "passive minority owner" with "no duties or obligations," and represented that he did not solicit Fund investments. He also answered "0" in response to the question "what percentage of your time is spent on this activity during regular business hours?"

In September 2016, Huntington developed a heightened supervision plan to oversee and monitor Kielczewski's Fund-related activities, based in part on Huntington's understanding that Kielczewski "does not solicit funds for [the Fund], but shares common clients." As part of this plan, Huntington conducted a quarterly review of Kielczewski's emails, cross referenced Fund trades with Kielczewski's client accounts, and required Kielczewski to confirm annually that he did not solicit investments in the Fund, a representation he made to Huntington in both September and December 2016.

**E.    Kielczewski provided misleading disclosures on Form U4 and four amendments.**

During his 2013 onboarding, Kielczewski completed a Form U4, which Huntington filed with FINRA, stating that that he was a "[s]ilent minority partner in [the Fund]" and that "0 hours per month [were] devoted [by him] to this business." Between January 2014 and December 2016, he responded to four Huntington compliance questionnaires, repeatedly stating that he had no updates to his U4. Based on those responses, Huntington filed four amendments to the U4 for Kielczewski, each of which reaffirmed Kielczewski's initial statement of no Fund involvement.

**F.    Huntington terminated Kielczewski after discovering his role at the Fund.**

On April 26, 2017, Huntington terminated the employment of Kielczewski after the firm's compliance department found that "actual activity and correspondence" showed his relationship with the Fund was "beyond passive." Huntington subsequently filed a Form U5 stating that Kielczewski had "misrepresented activity relating to an [outside business]" and had "engaged in private securities transactions without firm approval." In response, FINRA initiated an investigation of Kielczewski.

## II.    Procedural History

**A.    FINRA obtained information from Huntington and filed its Complaint against Kielczewski.**

In June 2017, as part of its investigation, FINRA asked Huntington to provide information about the firm's decision to terminate Kielczewski, including "[a]ny internal investigative report created by [Huntington]." On June 23, 2017, Huntington provided what it represented were "all non-privileged documents, correspondence, emails and memoranda that [Huntington] was reasonabl[y] able to obtain." Huntington also stated in its response to FINRA that the firm did "not waive any applicable privileges, including without limitation, the attorney-client and work-product privileges."

On May 21, 2019, FINRA issued a disciplinary complaint against Kielczewski alleging that he (1) participated in PSTs involving Huntington customers, in violation of NASD Rule 3040 and FINRA Rules 2010 and 3280, (2) falsely represented to Huntington that he was a mere passive owner of, and did not solicit investments in, the Fund, in violation of FINRA Rule 2010, and (3) willfully provided misleading information on his Form U4 and four amendments thereto, which caused Huntington to file a misleading Form U4 and four U4 amendments, in violation of FINRA Rules 1122 and 2010, and Article V, Section 2 of FINRA's By-Laws.

Shortly after filing the Complaint, on July 19, 2019, FINRA provided Kielczewski all records associated with its investigation, including Huntington's response letter to FINRA's information request, in which the firm stated that it had provided FINRA "non-privileged documents" about its investigation.

Two months later, on September 10, 2019, Kielczewski requested that FINRA compel Huntington to produce (1) internal communications related to the Fund and (2) records about FINRA's 2016 exam and Huntington's subsequent internal investigation of Kielczewski.[2] FINRA submitted Kielczewski's requests to Huntington, which produced responsive documents to FINRA on October 7, 2019. In doing so, Huntington again represented that it was providing "copies of all non-privileged" records and that it did not waive attorney-client or work-product privileges. On October 11, 2019, FINRA forwarded the documents, including these representations about privilege, to Kielczewski.

**B.      Kielczewski unsuccessfully sought to continue the hearing after learning of Huntington's privileged withholdings.**

On December 2, 2019, nine days before Kielczewski's December 11, 2019, hearing, Huntington moved to permit its counsel to attend that hearing to object to questions that might elicit privileged communications between Huntington's employees and its in-house counsel. Kielczewski's counsel initially claimed that Huntington's motion was the first time that he had learned the firm may have withheld privileged material. Kielczewski's attorney later claimed that he did not know about Huntington's October withholdings because he had "failed to pick up on" an error by an electronic discovery vendor. While acknowledging that it was neither Huntington's nor FINRA's fault that he did not know about the withheld documents sooner, and conceding that Huntington's responses "could support an inference that documents were being withheld," Kielczewski's attorney requested that the Hearing Officer find Huntington had waived privilege by not explicitly identifying the withheld documents and order that Huntington provide the documents or, alternatively, a privilege log. Kielczewski's attorney further requested the hearing be continued pending resolution of those issues.

The Hearing Officer denied these requests, noting that the hearing was scheduled to begin in just over a week, and that Kielczewski had not shown good cause for his delay. The Hearing Officer nevertheless said that he would resolve any privilege issues after the record was developed at the hearing, during which he would allow the parties to question Huntington witnesses about documents withheld on privilege grounds.

**C.      Witnesses testified about Kielczewski's involvement with the Fund.**

The hearing proceeded over four days, with nine witnesses. Kielczewski testified that he orally disclosed to Chapman his plan to encourage his former Fifth Third clients to move their accounts to Huntington by offering them the opportunity to invest in the Fund. Kielczewski, however, did not identify any specific conversations with Chapman or related written documents

---

[2]      *See* FINRA Rule 9252 (permitting a party to move for FINRA to invoke Rule 8210 to compel the production of documents from a third party).

to that effect, such as a memorializing email. Kielczewski also generally testified that Chapman informed compliance personnel and others at Huntington about Kielczewski's plan, who, according to Kielczewski's testimony, similarly approved of his efforts to market the Fund to Huntington clients.

Chapman testified differently. Although he admitted to being "well aware" that Kielczewski was involved with the Fund and assumed that the opportunity to invest in the Fund might be an incentive for Kielczewski's former Fifth Third clients to transfer business to Huntington, Chapman denied giving Kielczewski permission to solicit Huntington clients to invest in the Fund. According to Chapman, he and Kielczewski "had the conversation that you work here, you don't work at [the Fund]. [Kielczewski] understood that."

Several other Huntington employees testified similarly to Chapman. Mark Gregory and Stephen Dahlke (Huntington's chief compliance officers) and David Fitzsimmons (one of Kielczewski's immediate supervisors) all testified that they were unaware that Kielczewski was engaging in PSTs, were unaware of any arrangement in which Huntington permitted Kielczewski to actively solicit business for the Fund, and were never approached by Kielczewski or Chapman about such an arrangement.

Taylor also similarly testified that Chapman understood Taylor would promote the Fund to potential clients, while Kielczewski would merely encourage them to move their non-Fund holdings to Huntington. Taylor further acknowledged that Kielczewski directly solicited Fund investments from his Fifth Third clients and erroneously represented to Huntington that he devoted "0" hours to the Fund monthly.

After the hearing, Kielczewski again moved to compel Huntington to produce any withheld documents or to provide a privilege log. The Hearing Officer denied that motion, again finding that Kielczewski had not shown good cause for his delay in raising the issue.

## D.  FINRA found that Kielczewski engaged in the alleged violations and imposed sanctions.

The Hearing Panel found that Kielczewski engaged in the alleged violations. In doing so, the Hearing Panel credited the testimony of Chapman, Gregory, Dahlke, and Fitzsimmons, noting that it was "was consistent, plausible, and cross-corroborated, and it was not undercut on cross-examination." In making this credibility determination, the Hearing Panel assessed their demeanor and noted that "none of these witnesses evidenced bias against Kielczewski." The Hearing Panel suspended Kielczewski from associating with any FINRA member in any capacity for 18 months, fined him $50,000, ordered him to requalify by examination as a registered representative before reassociating with a member firm in any capacity, and imposed a year of heightened supervision for any subsequent FINRA member association.

FINRA's National Adjudicatory Council ("NAC") affirmed the Hearing Panel's findings of violations. The NAC also affirmed the Hearing Panel's sanctions, except it found

Kielczewski subject to a statutory disqualification for willfully providing misleading U4s, and thus removed the Hearing Panel's heightened supervision requirement.[3]

### III. Analysis

We review FINRA disciplinary actions to determine (1) whether the applicant engaged in the conduct FINRA found; (2) whether that conduct violated the provisions specified in FINRA's determination; and (3) whether those provisions are, and were applied in a manner, consistent with the purposes of the Exchange Act.[4]  We base our findings on an independent review of the record and apply a preponderance of the evidence standard.[5]

### A. Kielczewski engaged in PSTs in violation of NASD Rule 3040 and FINRA Rules 2010 and 3280.

FINRA found, and we agree, that Kielczewksi violated NASD and FINRA rules by offering and selling Fund securities to the Fund Investors without prior written notice to Huntington.  NASD Rule 3040 and FINRA Rule 3280 both explicitly prohibit associated persons such as Kielczewski from "participat[ing] in any manner in . . . any securities transaction outside the regular course or scope" of their employment with a FINRA member, including transactions for which they "may receive" compensation, absent detailed prior written notice.[6]  A violation of these rules is also a violation of FINRA Rule 2010.[7]  Here, the record establishes that Kielczewski, as part owner of the Fund, actively sold its securities without informing Huntington in writing, despite being told by Chapman that he could not do so, and after Huntington walled him off from the firm's Fund account due to potential conflicts of interest.  Indeed, Kielczewski concedes that he engaged in PSTs without providing Huntington the required written notice.

### B. Kielczewski made false representations in connection with the PSTs and his role at the Fund, in violation of FINRA Rule 2010.

FINRA found, and we agree, that Kielczewski also violated FINRA Rule 2010 by making "false and misleading statements to Huntington" with respect to his Fund-related PSTs and his active role at the Fund.  An associated person who provides false or misleading

---

[3]    FINRA's rules and by-laws generally prevent a person who is statutorily disqualified from associating or continuing to associate with a FINRA member firm unless the firm obtains FINRA's approval through the membership continuance process on the person's behalf.  *See* FINRA By-Laws, Art. III, §§ 3(b), 3(d), 4; FINRA Rules 9521-27.

[4]    15 U.S.C. § 78s(e)(1).

[5]    *See Richard G. Cody*, Exchange Act Release No. 64565, 2011 WL 2098202, at *9 & n.7 (May 27, 2011), *aff'd*, 693 F.3d 251 (1st Cir. 2012).

[6]    FINRA Rule 3280 superseded NASD Rule 3040 without substantive change in September 2015.

[7]    *See Kenny Akindemowo*, Exchange Act Release No. 79007, 2016 WL 5571625, at *8 (Sept. 30, 2016) (finding a violation of FINRA Rule 2010 due to applicant's violation of NASD Rule 3040).

information in compliance questionnaires and related communications with his firm violates Rule 2010's requirement that FINRA members "observe high standards of commercial honor and just and equitable principles of trade."[8]

Here, from 2013 to 2016, Kielczewski repeatedly claimed to Huntington in various required written disclosures that he had a passive role at the Fund and did not engage in PSTs. As he conceded at the hearing, however, Kielczewski actively participated in soliciting investments and managing the Fund.

Kielczewski nevertheless disputes that he misled Huntington because, he claims, he fully disclosed his Fund relationship to Huntington orally. But he points to no evidence of this, other than his own hearing testimony, which was vague regarding the dates, terms, and other details of his asserted disclosure. And the other evidence undercuts this claim. For example, the other Huntington personnel who testified at the hearing all contradicted Kielczewski's claims by testifying that he had not made any such oral disclosures. The firm also expressly implemented its 2016 heightened supervisory plan for Kielczewski's Fund activities on the premise that he had a passive involvement in the Fund. And Kielczewski did not claim to have made such oral disclosures before his testimony, such as when Huntington personnel confronted Kielczewski during the firm's 2016 investigation or during the subsequent meeting at which he was terminated.

Kielczewski also claims that he fully disclosed his active role in the Fund to FINRA personnel during their 2016 examination, but the record shows he told only FINRA of his passive interest. Nor would any such belated disclosures to FINRA excuse his earlier false and misleading statements to Huntington.

Moreover, even if Kielczewksi provided accurate oral disclosures to Huntington, he still provided the firm with written communications that were consistently inaccurate and affirmatively misrepresented the extent of his involvement with the Fund. And while Kielczewski claims that he summarized his role at the Fund in documents relating to a line of credit the Fund obtained from Huntington's affiliate bank, those documents merely stated that former Fifth Third clients (and prospective Huntington clients) would be investors in the Fund, without disclosing Kielczewski's role in soliciting them.

Kielczewski additionally claims he should not be held liable because Huntington had a financial incentive to ignore his role at the Fund and claims that he did not lie about his Fund activities because there was "confusion at every level at Huntington" about what was permissible—noting that FINRA Rule 3280 prohibited "participat[ing] in any manner" in PSTs, while Huntington's internal definitions of PSTs were more permissive of such activity. But Kielczewski has not established that there was such confusion about Huntington's requirements or that he ever raised this alleged confusion with compliance. As an associated person of a

---

[8]     FINRA Rule 2010; *see also, e.g.*, *Allen Holeman*, Exchange Act Release No. 86523, 2019 WL 3530381, at *9 (July 31, 2019) (applicant's "false response in his firm's Annual Compliance Certification was inconsistent with just and equitable principles of trade"), *pet. denied*, 833 F. App'x 485 (D.C. Cir. 2021).

FINRA member, Kielczewski was also expected to know and comply with FINRA's rules, as well as the requirements of his employer.[9]  And given that, as he argues, FINRA's rule was stricter than Huntington's requirements, he could have complied with both had he simply obeyed the FINRA rule.

**C.      Kielczewski violated FINRA By-Laws and Rules 1122 and 2010 by providing false information on his Form U4 and four U4 amendments**.

We further agree with FINRA that Kielczewski provided false information on his Form U4 and subsequent compliance disclosures in violation of FINRA By-Laws and rules, thus causing Huntington to file a false and misleading Form U4 and four false and misleading Form U4 amendments with FINRA.   FINRA Rule 1122 prohibits members or their associated persons from filing membership or registration information that is "incomplete or inaccurate so as to be misleading, or which could in any way tend to mislead," or from "fail[ing] to correct such filing after notice thereof."[10]  A violation of Rule 1122 is also a violation of FINRA Rule 2010.[11] Article V, Section 2(c) of the FINRA By-Laws further mandates that registrants keep information required by Form U4 "current at all times."[12]

It is undisputed that Kielczewski's statement in his initial U4—that his involvement in the Fund was "passive"—was untrue, a falsehood that he reaffirmed in four subsequent U4 amendments.  By misleading Huntington and FINRA about his significant Fund role in these multiple filings, Kielczewski violated FINRA Rules 1122 and 2010, as well as Article V, Section 2(c) of the FINRA By-Laws.[13]

---

[9]      *See Joseph R. Butler*, Exchange Act Release No. 77984, 2016 WL 3087507, at *6 (Jun. 2, 2016) (finding an experienced registered person "may be charged with understanding the importance of providing accurate information" to his employer); *see also William Scholander*, Exchange Act Release No. 77492, 2016 WL 1255596, at *6 (Mar. 31, 2016) (holding that "associated persons are responsible for their own compliance and cannot shift that responsibility to a supervisor . . . .").

[10]      FINRA Rule 1122.

[11]      *Michael Earl McCune*, Exchange Act Release No. 77375, 2016 WL 1039460, at *4 & n.14 (Mar. 15, 2016) ("Failing to timely amend a Form U4 when required violates . . . FINRA Rule 1122 and the high standards of commercial honor and just and equitable principles of trade to which FINRA holds its members and their associated persons under . . . FINRA Rule 2010." (collecting cases)).

[12]      FINRA By-Laws, Art. V § 2(c)*; see Bruce Zipper*, Exchange Act Release No. 84334, 2018 WL 4727001, at *4 (Oct. 1, 2018) ("Persons seeking registration as a registered representative must file with FINRA a complete and accurate Form U4 and have a continuing obligation to timely update information required by Form U4 as changes occur." (internal quotations omitted)).

[13]      *See, e.g.*, *David Adam Elgart*, Exchange Act Release No. 81779, 2017 WL 4335050, at *3-4 (Sept. 29, 2017) (finding that failure to disclose five unpaid tax liens on Form U4 violated

Kielczewski defends his false U4 disclosures by again claiming that Huntington knew they were inaccurate. As discussed above, the evidence does not support this claim. Moreover, the deliberate preparation of misleading compliance documents is a violation of FINRA Rules 1122 and 2010—regardless of knowledge of a supervisor.[14]

We also agree with FINRA that Kielczewski's provision of misleading information on his Form U4 and amendments was willful, and that he is thus statutorily disqualified. Exchange Act Section 3(a)(39)(F) and Article III, Section IV of the FINRA By-Laws specify that a person is subject to a statutory disqualification from associating with FINRA members if that person, like Kielczewski, has willfully made or caused to be made a misleading statement of material fact in a FINRA membership application or required report to FINRA.[15] Although courts have provided varying definitions of what "willfulness" means in the securities law context,[16] acting with scienter necessarily meets the definition of willfulness.[17]

Here, the record amply supports FINRA's finding that Kielczewski acted with scienter by knowingly—and thus willfully—misrepresenting his role at the Fund on the U4 and amendments.[18] Given his long-running and close personal involvement with the Fund, he

---

Article V, Section 2(c) of the FINRA By-Laws, and FINRA Rules 1122 and 2010), *pet. denied*, 750 F. App'x 821 (11th Cir. 2018).

[14]  *See, e.g.*, *Joseph S. Amundsen*, Exchange Act Release No 69406, 2013 WL 1683914, at *7-8 (Apr. 18, 2013) (finding Rule 1122 and 2010 violations over applicant's claim that he discussed omitted U4 information with his employer, because those discussions "d[id] not affect [applicant's] obligation to provide complete and accurate information on each Form U4 he completed").

[15]  15 U.S.C. § 78c(a)(39)(F); FINRA By-Laws, Art. III § 4.

[16]  *See, e.g.*, *Robare Grp., Ltd. v. SEC*, 922 F.3d 468, 479 (D.C. Cir. 2019) (holding that statutory text making it unlawful "willfully to omit any material fact from a Form ADV . . . signals that the Commission had to find, based on substantial evidence, that at least one of TRG's principals subjectively intended to omit material information from TRG's Form ADV" (cleaned up)); *Mathis v. US SEC*, 671 F.3d 210, 218 (2d Cir. 2012) (rejecting petitioner's "argument that a finding of 'willfulness' under § 3(a)(39)(F) would have required a determination that [he] was aware that he was violating a particular rule or regulation"); *Wonsover v. SEC*, 205 F.3d 408, 414 (D.C. Cir. 2000) (defining willfulness as "intentionally committing the act which constitutes the violation" (citation omitted)).

[17]  *See Robare*, 922 F.3d at 479-80; *Bennett Grp. Fin. Servs.*, Exchange Act Release No. 80347, 2017 WL 1176053, at *4 n.30 (Mar. 30, 2017) (finding that scienter demonstrates that violations were willful), *abrogated in part on other grounds by Lucia v. SEC*, 138 S. Ct. 2044 (2018); *cf. Allen Holeman*, Exchange Act Release No. 86523, 2019 WL 3530381, at *11–12 (July 31, 2019) (finding that applicant who acted with extreme recklessness had acted willfully).

[18]  *Cf. ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 65 (1st Cir. 2008) ("[T]he fact that a defendant knowingly made a false statement is 'classic evidence' of scienter." (citation omitted)).

plainly knew that he was not, as he wrote in his Form U4 and amendments, devoting "0" hours per month to the Fund or a "passive investor."[19] Kielczewski's misleading U4 disclosures were also material, in that there is a substantial likelihood that a reasonable regulator, employer, or customer would have viewed Kielczewski's participation in PSTs as significantly altering the total mix of information made available in Huntington's regulatory disclosures.[20]

**D.     FINRA's rules are, and were applied in a manner, consistent with the Exchange Act's purposes.**

We have stated repeatedly that the prohibition on engaging in PSTs is fundamental to an associated person's duties to his customers and his firm because such transactions "deprive[] investors of a brokerage firm's oversight, due diligence, and supervision—protections investors have a right to expect."[21] Thus, NASD Rule 3040 and FINRA Rule 3280 are consistent with the Exchange Act's purpose of "promot[ing] just and equitable principles of trade."[22] FINRA Rule 2010 also reflects the Exchange Act's mandate that FINRA adopt rules to promote just and equitable principles of trade.[23] FINRA Rule 1122 is similarly consistent with the purposes of the Exchange Act because "requiring members and associated persons to file accurate and complete Forms U4" is "critical to the effectiveness of the screening process used to determine who may enter (and remain in) the industry" by "enabl[ing] regulators and the public to determine and monitor the fitness of securities professionals," thus "serv[ing] as a means of protecting the investing public."[24]

FINRA applied these rules consistently with the Exchange Act's purposes. Because Kielczewski did not disclose the PSTs and mischaracterized his role at the Fund, neither Huntington nor any other broker-dealer oversaw his active solicitation of Fund investments. Investors and Huntington were thus deprived of the "oversight, due diligence, and supervision" to which they were entitled.[25]

---

[19]     *See Gopi Krishna Vungarala*, Exchange Act Release No. 90476, 2020 WL 6867617, at *12 (Nov. 20, 2020) (finding that applicant acted willfully for purposes of Exchange Act Section 3(a)(39) because he "acted at least recklessly when he made misrepresentations and omissions"); *Bruce Zipper*, Exchange Act Release No. 90737, 2020 WL 7496222, at *14 (Dec. 21, 2020) (holding that applicants who knowingly maintained inaccurate records acted willfully).

[20]     *McCune*, 2016 WL 1039460, at *4-6 (finding applicant statutorily disqualified for failing to amend Form U4 to disclose bankruptcy and tax liens).

[21]     *Blair C. Mielke*, Exchange Act Release No. 75981, 2015 WL 5608531, at *13 (Sept. 24, 2015).

[22]     15 U.S.C. § 78*o*-3(b)(6); *e.g.*, *Mielke*, 2015 WL 5608531, at *13.

[23]     *Fuad Ahmed*, Exchange Act Release No. 81759, 2017 WL 4335036, at *17 (Sept. 28, 2017).

[24]     *McCune*, 2016 WL 1039460, at *7 (finding FINRA Rule 1122 to be, and applied in a manner consistent with, the purposes of the Exchange Act) (cleaned up).

[25]     *Harry Friedman*, Exchange Act Release No. 64486, 2011 WL 1825025, at *10 (May 13, 2011).

We further find that the proceeding against Kielczewski was consistent with the Exchange Act's requirement that FINRA provide a fair procedure for disciplining its associated persons.[26] We review the "overall fairness" of a FINRA disciplinary action based on the "entirety of the record."[27] Here, Kielczewski argues that FINRA deprived him of a fair proceeding by denying his various requests related to Huntington's withholding certain documents on privilege grounds. We find no merit to those claims.

### 1. FINRA did not err in denying Kielczewski's motion to compel Huntington to produce documents or a privilege log.

Kielczewski claims that the FINRA Hearing Officer erred in declining to compel FINRA to require Huntington to produce withheld documents or a privilege log. We disagree. FINRA Rule 9252 specifies that parties shall file any requests for FINRA to compel the production of documents from members "no later than 21 days before the scheduled hearing date." Kielczewski's motion to compel documents or a privilege log was plainly untimely, as he made it only nine days before the hearing. He also did so despite receiving documents at least four months earlier stating that Huntington was producing only non-privileged documents—a position that Huntington reasserted in documents that Kielczewski received approximately two months before the hearing. Although Kielczewski's attorney claimed he had not seen Huntington's latter privilege claims because of a "vendor" error, he also admitted that a technology error did not excuse Kielczewski's untimely motion. Accordingly, we find no error in the Hearing Officer's denial of Kielczewski's request to produce documents or a privilege log as untimely.[28]

### 2. FINRA did not err in denying Kielczewski's motion to continue the hearing.

We similarly find no error in the Hearing Officer's conclusion that Kielczewski failed to show the necessary good cause to justify a continuance of the hearing pending Huntington's production of any withheld documents or a privilege log. FINRA rules require that a party establish good cause for a postponement,[29] and the Commission has held that hearing officers

---

[26]     Exchange Act Section 15A(b)(8), 15 U.S.C. § 78o-3(b)(8).

[27]     *Mark H. Love*, Exchange Act Release No. 49248, 2004 WL 283437, at *4 (Feb. 13, 2004).

[28]     *See, e.g.*, *Raghavan Sathianathan*, Exchange Act Release No. 54722, 2006 WL 3228694, at *7 (Nov. 8, 2006) (agreeing with NASD's denial of applicant's request to compel production of documents because it was not timely); *cf. John B. Busacca, III*, Exchange Act Release No. 63312, 2010 WL 5092726, at *14-15 (Nov. 12, 2010) (finding no error in FINRA's denial of applicant's Rule 9252 request, where applicant delayed notifying the hearing officer of his inability to independently obtain the requested documents until two weeks before the hearing).

[29]     FINRA Rule 9222(a); FINRA Rule 9222(b) (providing that, when determining whether to postpone a hearing, a hearing officer shall consider (1) the length of the proceeding, (2) the number of prior postponements, (3) the stage of the proceeding at the time of the request, (4) potential harm to the investing public if a postponement were granted, and (5) "such other matters as justice may require").

have "broad discretion" to consider such requests.[30]  Here, the Hearing Officer denied
Kielczewski's request for a continuance because Kielczewski did not raise the privilege issue
until "four and a half months after receiving Huntington's June 23, 2017 response; over a month
and a half after receiving the October 7, 2019 cover letters; and only nine days before the
hearing."  Moreover, the parties had stipulated to most of the relevant facts, the issues to be
resolved at the hearing were straightforward, and Kielczewski was able to question
knowledgeable witnesses about the privilege issue.[31]  We thus conclude that the Hearing Officer
acted well within his discretion to deny the continuance request.

### 3. FINRA was not required to independently investigate Huntington's disclosures on Kielczewski's behalf.

Kielczewski also claims that because FINRA transmitted Rule 8210 requests to
Huntington and received its responses—both as part of its initial investigation and later at
Kielczewski's request—FINRA should have sought, pursuant to Rule 9251, more specific
responses to Huntington's statements that it was producing only non-privileged documents.  But
Rule 9251 requires only that FINRA provide applicants with documents obtained as part of an
investigation leading to the institution of proceedings.  It does not require FINRA to challenge
privilege claims by third parties.  Rather, as we have noted in other contexts, it is an applicant's
obligation (not FINRA's) to marshal the evidence in his defense,[32] and "any failure to adduce
available evidence to meet the charges against him and show mitigating factors does not entitle
[applicant] to have the proceedings reopened after the issuance of an adverse decision."[33]

---

[30]     *Robert J. Prager*, Exchange Act Release No. 51974, 2005 WL 1584983, at *13 (Jul. 6,
2005); *see also Michael Nicholas Romano*, Exchange Act Release No. 76011, 2015 WL
5693099, at *5 & n.14 (Sept. 29, 2015) (stating the Commission will affirm a continuance unless
the hearing officer applied the wrong legal standard or made a "clear error" of judgment, with
the moving party "carry[ing] a heavy burden to succeed" (citations omitted)).

[31]     *See, e.g.*, *Richard Allen Riemer*, Exchange Act Release No. 84513, 2018 WL 5668898, at
*6-7 (Oct. 31, 2018) (finding no abuse of discretion in FINRA's denial of motion to continue,
where most facts were stipulated-to, the issues to be resolved were not complex, applicant did
not move for a continuance until less than a month before the hearing, and the applicant could
not show that the denial prejudiced him).

[32]     *In Re Montelbano*, Exchange Act Release No. 47227, 2003 WL 147562, at *13 n.8 (Jan.
22, 2003); *cf. also Edward Beyn*, Exchange Act Release No. 97325, 2023 WL 3017562, at *20
(Apr. 19, 2023) (rejecting applicant's argument that FINRA should have obtained documents
relevant to his defense and noting that applicant could have timely made a Rule 9252 request for
those documents).

[33]     *Robert D. Tucker*, Exchange Act Release No. 68210, 2012 WL 5462896, at *13 (Nov. 9,
2012) (quotations omitted).

**4. Kielczewski has not shown that FINRA's proceedings were otherwise unfair or prejudicial.**

Kielczewski broadly claims that he was prejudiced and denied a fair proceeding by his lack of access to the allegedly-exculpatory documents at issue. We disagree. The Hearing Officer gave Kielczewski wide latitude to question Huntington witnesses during the hearing about such documents, as well as Huntington personnel's knowledge of Kielczewski's Fund activities—the issues Kielczewski claims the withheld documents might address.[34] Despite such latitude, Kielczewski elicited no testimony indicating that Huntington knew and approved of his Fund role, improperly withheld exculpatory, documents or otherwise deprived him of records or information material to his defense.[35] Although Kielczewski claims that the Hearing Officer improperly required him, rather than Huntington, to establish the basis for Huntington's privilege claims during the hearing, the record shows the opposite: that the Hearing Officer required Huntington's counsel to establish the basis for her privilege objections. Similarly, while Kielczewski claims that the Hearing Officer repeatedly and prematurely sustained Huntington's privilege objections, the record shows that Huntington objected on just two occasions, and the Hearing Officer sustained only when the witnesses plainly stated they could not answer without referencing privileged communications with counsel.

Moreover, while Kielczewski identifies certain broad categories of withheld documents that "may" contain further information about Huntington's alleged understanding of his activities related to the Fund (such as personal notes taken and retained by testifying Huntington witnesses; records about Huntington's 2016 investigation; and certain employment records), Kielczewski does not dispute or address that the record contained numerous similar documents of this same type, including compliance department emails, minutes from meetings, and other employment-related documents—none of which suggested that Huntington knew the extent of Kielczewski's Fund activities. And an applicant is not "entitled to conduct a fishing expedition in an effort to discover something that might assist him in his defense."[36]

Nor do we agree with Kielczewski that Huntington waived its privilege claims by not specifying the documents that it was withholding (and the basis for withholding them) or, alternatively, by not identifying such documents in a privilege log. In support of this argument,

---

[34]  *See Guang Lu*, Exchange Act Release No. 51047, 2005 WL 106888, at *8 (Jan. 14, 2005) (finding no error in denial of motion to compel production of documents from firm supervisor when applicant was able to cross-examine supervisor at the hearing), *aff'd*, 179 F. App'x 702 (D.C. Cir. 2006); *cf. Sathianathan*, 2006 WL 3228694, at *8 (finding no error where FINRA permitted testimony regarding the contents of an e-mail not in evidence).

[35]  *See Beyn*, 2023 WL 3017562, at *21 (finding no error in FINRA denial of Rule 9252 motion where applicant had "not shown that the record contained insufficient information" concerning the sought-after information); *Busacca*, 2010 WL 5092726, at *14-15 (finding no error in FINRA's denial of Rule 9252 motion where the record contained other "competent evidence" about the documents at issue, including witness testimony).

[36]  *Scott Epstein*, Exchange Act Release No. 59328, 2009 WL 223611, at *17 n.54 (Jan. 30, 2009) (cleaned up), *aff'd*, 416 F. App'x 142 (3d Cir. 2010).

Kielczewski cites precedent under the Federal Rules of Civil Procedure, but those rules do not apply here.[37] And while FINRA Rule 9251(c) provides that a hearing officer can order FINRA's Department of Enforcement to submit a privilege log for materials that *Enforcement* withheld based on privilege or other specified reasons, FINRA's rules do not require third parties to provide such logs. Kielczewski also had opportunities to pursue these waiver arguments, but failed to timely do so before the hearing.

Kielczewski further suggests that Huntington also improperly withheld other documents in response to seven different FINRA document requests that it made from August 15, 2017, to May 8, 2019. But Kielczewski has made no specific argument on this point, and we find, based upon our independent review of the record, that the preponderance of the evidence does not establish that Huntington withheld any documents from FINRA in relation to those requests.

## IV. Constitutional Claims

After the completion of briefing in this proceeding, Kielczewski filed a motion requesting that the Commission "vacate the FINRA determination against him and dismiss the action" or, alternatively, postpone this proceeding in light of the D.C. Circuit's decision in *Alpine Securities Corp. v. FINRA*.[38] Kielczewski argues that Congress unconstitutionally delegated executive authority to FINRA, a private entity. Alternatively, Kielczewski argues that "FINRA takes governmental action" and as a result: the process used to appoint FINRA hearing officers violates the Appointments Clause; the process to remove FINRA hearing officers violates the Constitution's separation of power guarantees; and the Constitution's due process and jury trial rights applied to FINRA's disciplinary proceeding.

As a threshold matter, Kielczewski forfeited these arguments by failing to raise them before FINRA.[39] Challenges premised on constitutional claims are not exempt from "ordinary principles of waiver and forfeiture."[40] In addition to being forfeited, these arguments also lack merit.

The non-delegation doctrine, Appointments Clause, and removal claims that Kielczewski asserts here are substantially similar to challenges that have been raised in federal courts to

---

[37] *See, e.g.*, *Beyn*, 2023 WL 3017562, at *17 n.86 (holding that the Federal Rules of Civil Procedure do not apply to a FINRA proceeding).

[38] 121 F.4th 1314 (D.C. Cir. 2024).

[39] *See, e.g.*, *Newport Coast Sec., Inc.*, Exchange Act Release No. 88548, 2020 WL 1659292, at *16 (Apr. 3, 2020) (finding that applicant's "failure to raise its Appointments Clause argument before FINRA is reason enough for us to reject it now").

[40] *Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018) (citation omitted); *see, e.g.*, *Newport Coast*, 2020 WL 1659292, at *15-17 (finding waiver of constitutional arguments where they were not first raised before FINRA).

FINRA's structure and operations.[41]  As described below, we follow the lead set by the courts on these constitutional questions to conclude that Kielczewski's claims do not have merit.  Briefs filed by the Commission and by the Department of Justice in other proceedings have discussed in detail the type of constitutional claims that Kielczewski raises.[42]  We agree with that analysis and therefore explain only briefly why we conclude that Kielczewski's claims lack merit.

## A.    Kielczewski's private non-delegation claim fails.

The Supreme Court has recognized that Congress may enlist the aid of a private organization in administering federal law without running afoul of the non-delegation doctrine as long as the private actor "function[s] subordinately" to a government agency that exercises "authority and surveillance" over its activities.[43]  Courts have repeatedly recognized that the relationship between FINRA and the Commission satisfies these private non-delegation principles.[44]

Through the Exchange Act, Congress gave the Commission "pervasive supervisory authority" over the rulemaking and enforcement activities of FINRA and other self-regulatory organizations in order to protect "the public interest."[45]  For example, FINRA's proposed rules for its members generally only take effect if the Commission approves the rules after public notice and comment, and the Commission "may abrogate, add to, and delete from" those rules.[46]  The Commission also exercises supervisory authority over FINRA's disciplinary decisions,

---

[41]    *See, e.g.*, *Alpine Sec. Corp. v. Nat'l. Sec. Clearing Corp.*, No. 2:23-CV-00782-JNP-JCB, 2024 WL 1011863, at *6 (D. Utah Mar. 8, 2024) (concluding that the applicant "has not demonstrated a likelihood of success" as to its claim that self-regulatory organizations "are unconstitutionally structured under the Appointments Clause" or that the authority "delegated to [them] violates the constitutional nondelegation doctrine"), *injunction pending appeal denied*, Order, Case No. 24-4027, ECF No. 11074625 (10th Cir. Mar. 15, 2024).

[42]    *See* Br. for Respondent SEC, *Black v. SEC*, Case No. 23-2297, ECF No. 45 (4th Cir. July 8, 2024); *see also* Def. SEC's Combined Br. in Supp. of Cross-Mot. for Summ. J. & Opp. to Pl.'s Mot. for Summ. J., *Black v. FINRA*, Case No. 3:23-cv-709-RJC-DCK, ECF No. 51-1 (W.D.N.C. Apr. 4, 2025); Mem. of Law of Intervenor United States in Defense of the Challenged Provisions of the Sec. Laws, *Alpine Sec. Corp. v. Nat'l Sec. Clearing Corp.*, Case No. 2:23-cv-00782-JNP-JCB, ECF No. 30 (D. Utah Jan. 29, 2024).

[43]    *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940).

[44]    *See, e.g.*, *Sorrell v. SEC*, 679 F.2d 1323, 1325-26 (9th Cir. 1982) (upholding arrangement against a challenge that Congress unconstitutionally delegated power to self-regulatory organizations to impose disciplinary sanctions); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 697 (3d Cir. 1979); *R. H. Johnson & Co. v. SEC*, 198 F.2d 690, 695 (2d Cir. 1952); *cf. Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314 (D.C. Cir. 2024) (discussed below).

[45]    *United States v. NASD*, 422 U.S. 694, 732-33 (1975); *see also Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023) (observing that the Commission "oversees both [FINRA's] rulemaking and [its] enforcement").

[46]    *See* 15 U.S.C. § 78s(b)(1), (2)(C), (c).

including plenary review over its final disciplinary actions—the very process Kielczewski has pursued here.[47]  The Commission may even suspend or revoke FINRA's registration if, in the Commission's opinion, "such action is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance" of the Exchange Act's purposes.[48]

Although the D.C. Circuit recently found that an applicant for a preliminary injunction had demonstrated a likelihood of success on a nondelegation claim against FINRA, the circumstances that were crucial to the D.C. Circuit's decision are not present here.[49]  Specifically, the court determined that plenary Commission review of a FINRA expedited expulsion proceeding was "not available as a practical matter" before the expulsion forced the business to close—thus leaving a "gap" in Commission oversight of FINRA's disciplinary proceedings.[50]  Here, by comparison, the same procedural posture and concerns are not present in our review of FINRA's final disciplinary decision.[51]

**B.**     **Kielczewski's Article II appointment and removal claims fail.**

Kielczewski has also not established that Article II's appointment and removal requirements apply to FINRA personnel.  By their terms, those structural constitutional requirements apply only to "Officers of the United States,"[52] and Article II "says nothing" about the method of hiring or firing "some other type of officer" that is not an officer "of the United States."[53]  FINRA is not "part of the government" under the Supreme Court's test in *Lebron v. National Railroad Passenger Corp.* because it was not created by the government and its leaders are not chosen by the government.[54]  FINRA is instead a private, non-profit corporation

---

[47]     *See id.* § 78s(e); *see also NASD v. SEC*, 431 F.3d 803, 806 (D.C. Cir. 2005) (recognizing that the Exchange Act "provides the Commission with plenary review powers" over self-regulatory organizations' disciplinary sanctions).

[48]     15 U.S.C. § 78s(h)(1).

[49]     *See Alpine Sec.*, 121 F.4th at 1330-31 (finding a likelihood of success on a preliminary injunction applicant's nondelegation claim where FINRA expelled the applicant in an expedited proceeding and the expulsion was allowed to take effect before the completion of Commission review proceedings).

[50]     *Id.* at 1331.

[51]     *See, e.g., id.* at 1326-28 (distinguishing between the Commission's oversight of FINRA through review of final FINRA decisions or sanctions and the more limited circumstances in *Alpine Securities* involving whether to stay the effectiveness of an expedited expulsion order pending Commission review).

[52]     U.S. CONST. art. II, § 2, cl. 2.

[53]     *Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1658 (2020).

[54]     513 U.S. 374, 399 (1995).  Kielcewski conflates the *Lebron* test with the state-action doctrine, under which a private entity's specific actions can be attributed to the government.  *See, e.g., NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 43 (D.C. Cir. 2015).  Whether a

incorporated under Delaware law.[55]  As a private entity (acting subject to the supervision and authority of the Commission pursuant to private non-delegation principles), FINRA's processes for selecting or terminating its personnel—including with respect to hearing officers and the composition of hearing panels—are not subject to the Appointments Clause or constitutional limitations on removal restrictions.

## C.    Kielczewski's Fifth Amendment due process and Seventh Amendment jury trial claims fail.

Finally, a threshold requirement for Kielczewski's Fifth Amendment due process and Seventh Amendment jury trial claims is "a demonstration that in denying plaintiff's constitutional rights, the defendant's conduct constituted state action."[56]  But courts have held that the requirements of constitutional due process and jury trial rights do not apply to FINRA (or its predecessor), because it is not a state actor.[57]

## V.    Sanctions

Under Exchange Act Section 19(e)(2), we sustain FINRA sanctions unless we find, having due regard to the public interest and the protection of investors, that the sanctions are excessive or oppressive or impose an unnecessary or inappropriate burden on competition.[58]  We consider any aggravating or mitigating factors[59] and whether the sanctions imposed are remedial

---

private entity takes action that may "be deemed that of the state" is a different question from whether an entity is part of the "Government itself" under *Lebron*.  *See Herron v. Fannie Mae*, 861 F.3d 160, 167 (D.C. Cir. 2017) (distinguishing between those two questions).  The state-action doctrine does not bear on whether an entity is part of the government subject to the structural constitutional requirements applicable to the government itself.

[55]    *See, e.g.*, *Jones v. SEC*, 115 F.3d 1173, 1183 (4th Cir. 1997) ("While the NASD is a closely regulated corporation, it is not a governmental agency, but rather a private corporation organized under the laws of Delaware.").

[56]    *Desiderio v. NASD*, 191 F.3d 198, 206 (2d Cir. 1999).  Fifth and Seventh Amendment claims were not at issue in *Alpine*.  *See Alpine Sec.*, 121 F.4th at 1324 n.2 (noting that Alpine did not raise Fifth and Seventh Amendment claims on appeal).

[57]    *See, e.g.*, *Santos-Buch v. FINRA*, 591 F. App'x 32, 33-34 (2d. Cir. 2015) (concluding that "FINRA is not a state actor that can be held to constitutional standards," but is instead "a private actor whose conduct . . . is not fairly attributable to the government" (quotation omitted) (collecting cases)); *Epstein v. SEC*, 416 F. App'x 142, 148 (3d Cir. 2010) ("Epstein cannot bring a constitutional due process claim against the NASD, because '[t]he NASD is a private actor, not a state actor.'" (alteration in original) (citation omitted)); *Desiderio*, 191 F.3d at 206 (2d Cir. 1999) (rejecting Seventh Amendment claim because "NASD is a private actor, not a state actor").

[58]    15 U.S.C. § 78s(e)(2).  Kielczewski does not allege, nor does the record show, that the sanctions imposed create an unnecessary or inappropriate burden on competition.

[59]    *See Saad v. SEC*, 718 F.3d 904, 906 (D.C. Cir. 2013) (explaining that, in reviewing FINRA's imposition of sanctions, "the SEC must carefully consider whether there are any

or impermissibly punitive.[60]  In imposing sanctions, FINRA relied on its Sanction Guidelines.[61]  Although not binding on us, we use the Guidelines as a benchmark for assessing sanctions.[62]  For the reasons below, we sustain the sanctions imposed by FINRA.

FINRA's sanctions—an 18-month suspension (with a requirement that Kielczewski requalify before reassociating with any member firm) and $50,000 fine—are well within FINRA's Guidelines for PSTs; falsification of records; misrepresentations; and false, inaccurate, or misleading Forms U4.[63]  For PSTs like Kielczewski's, for example, the Guidelines recommend, as a starting point, a fine between $5,000 and $77,000, a suspension of at least one year, or a bar.

We find that FINRA's imposition of sanctions was in the public interest and necessary for the protection of investors.  Kielczewski's violations were serious.  The prohibition on private securities transactions "is fundamental to an associated person's duties to his customers and his firm," and such misconduct "deprives investors of a brokerage firm's oversight, due diligence, and supervision—protections investors have a right to expect."[64]  Similarly, "[a] representative's truthfulness in answering the financial disclosure questions on the Form U4 is a particularly critical measure of fitness for the industry because a commitment to accurate, complete, and non-misleading financial disclosure is central to any securities professional's responsibilities."[65]  Thus, while Kielczewski argues that his misconduct did not cause direct customer harm, his failure to accurately represent his Fund involvement to Huntington had

---

aggravating or mitigating factors that are relevant to the agency's determination of an appropriate sanction").

[60]     *PAZ Sec., Inc. v. SEC*, 494 F.3d 1059, 1065-66 (D.C. Cir. 2007) (directing the Commission, when reviewing NASD's imposition of sanctions, to determine whether "those sanctions were remedial rather than punitive").

[61]     FINRA applied the version of its Guidelines in place at the time of the NAC's decision. *See* https://www.finra.org/sites/default/files/2021-10/Sanctions_Guidelines_2020.pdf. Kielczewski does not object to FINRA's use of this version of the Guidelines

[62]     *Cf. Saad*, 718 F.3d at 911 (holding that the Commission did not err in sustaining sanction predicated on FINRA's sanctions guidelines).

[63]     *See* Guidelines at 14 (PSTs), 37 (falsification of records), 89 (misrepresentations), 71 (false, inaccurate, or misleading Forms U4).

[64]     *Mielke*, 2015 WL 5608531, at *13.

[65]     *Tucker*, 2012 WL 5462896, at *9; *see also McCune*, 2016 WL 1039460, at *9 ("Self-regulatory organizations, state regulators, and broker-dealers critically rely upon Form U4 to determine whether an applicant is fit for registration as a securities professional." (collecting cases)).

significant potential for harm by undermining his firm's "ability to detect actual or potential conflicts of interest, or other violative conduct."[66]

Kielczewski's conduct was, at minimum, reckless, as he plainly knew that his activities were far more extensive than he disclosed.[67] His misconduct was also repeated—he ultimately engaged in PSTs totaling approximately $10 million with five Huntington customers over two years, without disclosing them in writing.[68] In doing so, Kielczewski deceived Huntington in numerous compliance questionnaires, emails, and Forms U4 by not disclosing his significant role in soliciting investments for the Fund.[69] These repeated efforts to obscure his misconduct and mislead the firm raise significant doubts about Kielczewski's honesty and commitment to fundamental requirements of the self-regulatory system, which depend on, among other things, supervisory systems that are fully apprised of relevant circumstances related to the personnel being supervised.[70]

We acknowledge that Kielczewski has expressed remorse and promises to avoid future violations.[71] We also agree with FINRA that Huntington's termination of Kielczewski

---

[66] *Mielke*, 2015 WL 5608531, at *20 (also noting that such violations impede detection of other potentially violative conduct); *see also* Guidelines at 7 (Principal Consideration No. 11 (whether misconduct "directly *or indirectly*" harmed "other parties, "including the *investing public*" (emphases added))).

[67] *See* Guidelines at 8 (Principal Consideration No. 13 ("Whether the respondent's misconduct was the result of an intentional act, recklessness or negligence.")); *see also supra* notes 19-20 and accompanying text.

[68] Like the NAC, we considered when evaluating the appropriate sanctions approximately $5 million in PSTs that Enforcement did not include in its complaint involving HGI, and WI and RI. *See Howard Braff*, Exchange Act Release No. 66467, 2012 WL 601003, at *6 & n.22 (Feb. 24, 2012) (considering uncharged conduct in assessing appropriate sanctions); *see also* Guidelines at 7-8 (Principal Consideration Nos. 8, 9, and 17 (whether respondent engaged in a "pattern of misconduct," "over an extended period," and "[t]he number, size and character of the transactions at issue")).

[69] *See Denise M. Olson*, Exchange Act Release No. 75838, 2015 WL 5172954, at *3 (Sept. 3, 2015) (considering aggravating applicant's attempt to conceal her misconduct and deceive her firm); Guidelines at 7 (Principal Consideration No. 10 ("Whether the respondent attempted to conceal his or her misconduct or . . . deceive . . . the member firm with which he or she is/was associated.")).

[70] *See, e.g.*, *Saliba*, 2024 WL 1603297, at *8 ("[A]ctions that subvert FINRA's regulatory processes through the submission of false information . . . mislead [FINRA] and can conceal wrongdoing.").

[71] *See Olson*, 2015 WL 5172954, at *5 (the Commission has "consistently" sustained FINRA's decision to consider acknowledgement of misconduct and remorse mitigating).

materially reduced the likelihood of future misconduct on his part.[72]  However, we do not find that Kielczewski's claims of a good faith belief that Huntington knew and approved of his Fund-related activities offset the aggravating factors here.  As discussed above, the record refutes his suggestion that the firm knew or approved of anything beyond a passive investor role at the Fund.  Kielczewski also admitted that he was aware that he could not solicit customers for the Fund, that Huntington did not permit PSTs, and that he could not make false statements to Huntington or FINRA.  Similarly, while Kielczewski claims that the firm's guidance on PSTs was unclear; Kielczewski's repeated willingness to misrepresent his role at the Fund, even when explicitly asked for clarification, undercuts any suggestion that his disclosures were inadvertent.

Nor do we agree with Kielczewski that the lack of even more aggravating factors militates against the sanctions that FINRA imposed.  We expect associated persons to comply with the securities laws and FINRA's rules.[73]  We thus recognize that, as he argues, Kielczewski has no prior disciplinary history, did not violate other rules, did not recruit other registered representatives for his PSTs, disclosed his Fund interest to his customers, and ceased his Fund activity after Huntington directed him to do so.  But even taking all this together, the fact that Kielczewski did not engage in such additional, potentially aggravating conduct does not change our conclusion that FINRA's imposition of sanctions was appropriate and well within the Guidelines' range.[74]  And although he earned no direct commissions or profits from the PSTs, they created the potential for financial gain with respect to the customers who decided to open accounts with him at Huntington and the Fund.[75]

Taking all these factors together, we find that FINRA's 18-month suspension, requalification requirement, and $50,000 fine are consistent with the Guidelines and are neither excessive nor oppressive.

---

[72]     *See* Guidelines at 5 (Principal Consideration No. 7 (whether "a firm's termination of the respondent's employment has materially reduced the likelihood of misconduct in the future")).

[73]     *See, e.g.*, *Siegel v. SEC*, 592 F.3d 147, 157 (D.C. Cir. 2010) (affirming the Commission's view that a securities professional "should not be rewarded" for satisfying his legal obligations); *North Woodward Fin. Corp.*, Exchange Act Release No. 74913, 2015 WL 2151765, at *8 (May 8, 2015) ("When Applicants registered with FINRA, they agreed to abide by its rules . . . .").

[74]     *Cf. Blair Alexander West*, Exchange Act Release No. 74030, 2015 WL 137266, at *12 & n.54 (Jan. 9, 2015) (collecting cases declining to find the absence of aggravating factors mitigating); Guidelines at 7 ("[T]he presence of certain factors [in a case] may be aggravating, but their absence does not draw an inference of mitigation.  The relevancy and characterization of a factor depends on the facts and circumstances of a case and the type of violation." (footnote omitted)).

[75]     *See* Guidelines at 8 (Principal Consideration No. 16 (whether the misconduct "resulted in the potential for the respondent's monetary or other gain")); *Ahmed Gadelkareem*, Exchange Act Release No. 82879, 2018 WL 1324737, at *8 (Mar. 14, 2018) (finding no mitigation where applicant did not directly profit from his misconduct but "his actions were taken to obtain financial gain").

An appropriate order will issue.[76]

By the Commission (Chairman ATKINS and Commissioners PEIRCE, CRENSHAW, and UYEDA).


Vanessa A. Countryman
Secretary

---

[76] Because our decisional process would not be "significantly aided" by it, Kielczewski's request for oral argument is denied. Rule of Practice 451(a), 17 C.F.R. § 201.451(a). We have considered all of the parties' contentions. We have rejected or sustained them to the extent that they are inconsistent or in accord with this opinion.

UNITED STATES OF AMERICA
before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 104352 / December 9, 2025

Admin. Proc. File No. 3-20636

---

In the Matter of the Application of

WILLIAM JOSEPH KIELCZEWSKI

For Review of Disciplinary Action Taken by

FINRA

---

ORDER SUSTAINING DISCIPLINARY ACTION TAKEN BY FINRA

On the basis of the Commission's opinion issued this day, it is

ORDERED that FINRA's findings of violations against William Joseph Kielczewski are sustained; and it is further

ORDERED that the sanctions imposed by FINRA against William Joseph Kielczewski are sustained.

By the Commission.

Vanessa A. Countryman
Secretary